*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0401P (6th Cir.)
File Name: 01a0401p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

PIERROT BEJJANI,

                *Petitioner,*

    *v.*

IMMIGRATION AND
NATURALIZATION SERVICE;
JOHN ASHCROFT, Attorney
General of the United States,[*]

                *Respondents.*

No. 01-3117

On Petition for Review of an Order of the
Immigration and Naturalization Service.
No. A24 884 770.

Argued: May 4, 2001

Decided and Filed: November 14, 2001

———————

[*]According to 8 U.S.C. § 1252(b)(3)(A), the respondent to a petition for review under INA § 242 is the Attorney General. John Ashcroft is substituted for his predecessor, Janet Reno, as Attorney General of the United States. Fed. R. App. P. 43(c)(2).

Before:  NORRIS and COLE, Circuit Judges;
HOLSCHUH, District Judge.[**]

———————————

**COUNSEL**

———————————

**ARGUED:** Richard H. Drucker, DRUCKER & DRUCKER, Cleveland, Ohio, for Petitioner.  Susan K. Houser, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondents. **ON BRIEF:** Richard H. Drucker, DRUCKER & DRUCKER, Cleveland, Ohio, for Petitioner.  Susan K. Houser, Richard M. Evans, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondents.

———————————

**OPINION**

———————————

JOHN D. HOLSCHUH, District Judge.  Petitioner Pierrot Bejjani ("Bejjani") seeks direct review of the January 29, 2001 decision of the Immigration and Naturalization Service ("INS") to reinstate a prior order of deportation pursuant to § 241(a)(5) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(a)(5).  For the reasons set forth herein, we **GRANT** Bejjani's petition for review, **VACATE** the January 29, 2001 order of reinstatement, and **REMAND** this matter for further proceedings not inconsistent with this opinion.

## I.  FACTUAL BACKGROUND

Petitioner Bejjani is a native and citizen of Lebanon who entered the United States on April 4, 1983 as a lawful permanent resident.  In September, 1987, Bejjani pled guilty

———————————

[**] The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

to a charge of possession with intent to distribute 650 grams of heroin, and was sentenced to a two year term of imprisonment and a mandatory special parole term of three years.

In January, 1989, the INS served Bejjani with an order to show cause, charging that he was subject to deportation pursuant to § 241(a)(11) of the INA, because of his conviction for trafficking in a controlled substance. Bejjani appeared before an immigration judge and admitted the allegations contained in the show cause order. In June, 1991, Bejjani requested leave to file for relief from deportation pursuant to § 212(c) of the INA. In January, 1992, an immigration judge denied Bejjani's § 212(c) application and ordered him to be deported to Lebanon. Bejjani appealed to the Board of Immigration Appeals ("BIA"), which affirmed the decision of the immigration judge on July 30, 1993. Bejjani appealed the BIA decision to this Court, which dismissed the appeal in April, 1994.

Bejjani voluntarily left the United States in March, 1996. Bejjani used his Lebanese passport for travel, and was gone from the United States for seventeen days. On April 12, 1996, he reentered the United States through Boston, Massachusetts. The parties dispute the exact details of his reentry. The INS asserts that Bejjani presented his invalid Alien Registration Card at the port of entry, and thus illegally reentered the country. Bejjani maintains that his reentry was legal, because he was inspected by INS officers and given permission to return to the United States.

In March, 1999, the INS issued a warrant of removal to Bejjani. On January 23, 2001, Bejjani filed a petition for a writ of habeas corpus in the District Court for the Northern District of Ohio, asking the court to restrain his deportation and to order the INS to consider his application for relief from deportation. Also on January 23, 2001, the INS issued a "Notice of Intent/Decision to Reinstate Prior Order," indicating that the INS intended to reinstate the order of

deportation issued in 1992, pursuant to INA § 241(a)(5).[1] This notice stated, "You may contest this determination by making a written or oral statement to an immigration officer. You do not have the right to a hearing before the Immigration Judge." On January 29, 2001, the INS issued a decision to reinstate the order of deportation, and on January 30, 2001, the INS issued a warrant of removal. Bejjani's habeas petition was dismissed on January 30, 2001.

On January 31, 2001, Bejjani, who was represented by counsel, submitted a response to the decision to reinstate the prior order of deportation. In that response, Bejjani argued that his April, 1996 reentry into the United States was legal, and that INA § 241(a)(5) applies only to illegal reentries. In the alternative, Bejjani argued that even if his reentry was illegal, INA § 241(a)(5) applies only to reentries which occurred after April 1, 1997, the effective date of the reinstatement provision, and thus does not apply retroactively to aliens who voluntarily departed and reentered the country prior to the effective date. Bejjani further argued that assuming he did reenter illegally, § 241(a)(5) applies only to removal orders, and not to deportation orders. Finally, Bejjani argued that § 241(a)(5) violates the Due Process Clause, because it deprives aliens of a hearing before an immigration judge, the right to appeal to the BIA, the right to develop a record, the right to counsel and the right to adequate notice of the government's intended action.

On February 1, 2001, the INS directed Bejjani to report for deportation on February 9, 2001. On February 7, 2001, Bejjani petitioned this Court for review of the reinstatement of the deportation order, and moved the Court to stay the

---

[1]INA § 241(a)(5) was added by the Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. 104-208, 110 Stat. 3009-546 (1996), and is codified at 8 U.S.C. § 1231(a)(5). Section 241(a)(5) provides that if an alien illegally reenters the country after having been removed or having departed voluntarily under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed.

process), the date the alien is released from detention or confinement.

In this case, Bejjani petitioned for judicial review, and the Court ordered a stay of his removal. Under § 1231(a)(1)(B)(ii), the period of removal would not begin until the date of the Court's final order. Thus, the INS did not have the authority to detain Bejjani because the removal period had not begun.

## IV. CONCLUSION

The INS erred in reinstating Bejjani's order of deportation pursuant to INA § 241(a)(5), because that section applies only to reentries which occurred after IIRIRA's effective date. Should the INS choose to reinstate Bejjani's order of deportation, it must do so pursuant to the pre-IIRIRA reinstatement provision, 8 U.S.C. § 1252(f) (repealed 1996) and its attendant regulation, 8 C.F.R. § 242.23 (repealed 1997). Thus, we hereby **GRANT** Bejjani's petition for review, **VACATE** the January 29, 2001 order of reinstatement, and **REMAND** this matter for further proceedings not inconsistent with this opinion. We **VACATE** the stay of the reinstatement order and the stay of the requirement that Bejjani report to an immigration officer.

authority of the INS to issue the January 29 order of reinstatement." Thus, whether or not the stay was necessary, it was well justified under the standard enunciated above. Bejjani had a strong likelihood of success on the merits, and he would have been removed from the country absent the stay. Although his removal may not have been a totally "irreparable" harm, the potential harm was substantial, particularly in light of the important question of law presented by his petition for review. Furthermore, the potential harm to Bejjani greatly outweighed any inconvenience to the INS, and the stay certainly served the public interest of ensuring that the INS complies with the law. Therefore, even though we were not required to stay Bejjani's removal order in order to preserve review of this matter, we find that we did not err in doing so.

### E. Stay of Reporting Requirement

In addition to staying the execution of Bejjani's order of removal, in our February 8, 2001 Order, we also stayed the requirement that Bejjani report to an immigration officer on February 9, 2001 for deportation. The INS subsequently moved the Court to modify the order, to require Bejjani to report to an immigration officer. The INS argued that pursuant to INA § 241, 8 U.S.C. § 1231, it has the authority to detain an alien during a removal period and to provide for supervised release upon the expiration of the removal period. We did not rule on the INS motion.

Under 8 U.S.C. § 1231(a)(2), the Attorney General has the authority to detain an alien during the removal period. The removal period is the period of 90 days after an alien is ordered removed. *See* 8 U.S.C. § 1231(a)(1)(A). Under 8 U.S.C. § 1231(a)(1)(B), however, the removal period does not begin until the latest of: (i) the date the order of removal becomes administratively final; (ii) if the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order; or (iii) if the alien is detained or confined (except under an immigration

execution of the order of reinstatement. On February 8, 2001, the Court issued an order staying the execution of the order of reinstatement, and staying the requirement that Bejjani report to an immigration officer on February 9, 2001. In that order, the Court instructed the parties to address the propriety of the stay, appellate jurisdiction and the merits of the order of reinstatement.

On appeal, we are presented with five issues. First, Bejjani contends that he legally reentered the country in 1996, and thus the INA's reinstatement provision does not apply to him. Second, Bejjani argues that even if he reentered illegally, INA § 241(a)(5), the new reinstatement provision added by the Illegal Immigration and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104-208, 100 Stat. 3009-546 (1996), does not apply to him, because he reentered the country prior to the effective date of the statute. He asserts that the reinstatement provision repealed by IIRIRA, INA § 242(f), 8 U.S.C. § 1252(f) (repealed), and its attendant regulations should apply to his reinstatement proceeding. Third, Bejjani submits that even if the new reinstatement provision applies to him, the statute and its attendant regulations violate his right to Due Process, and thus the prior reinstatement provision applies. Fourth, we must consider our decision to stay the order of removal. Finally, we must consider our decision to stay the requirement that Bejjani report to the INS.

### II. JURISDICTION

This Court has jurisdiction over Bejjani's petition for review pursuant to INA § 242(b), 8 U.S.C. § 1252(b), which authorizes the courts of appeals to review orders of removal. This provision also applies to orders of reinstatement. *See Velasquez-Gabriel v. Crocetti*, 263 F.3d 102, 105 (4th Cir. 2001); *Castro-Cortez v. INS*, 239 F.3d 1037, 1043-44 (9th Cir. 2001).

## III.  DISCUSSION

The Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009-546 (1996), amended the Immigration and Nationality Act ("INA").  Prior to the enactment of IIRIRA, § 242(f) of the INA, codified at 8 U.S.C. § 1252(f), governed the reinstatement of prior orders of deportation.  Section 242(f) provided:

Unlawful reentry

Should the Attorney General find that any alien has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation, whether before or after June 27, 1952, on any ground described in any of the paragraphs enumerated in subsection (e) of this section, the previous order of deportation shall be deemed to be reinstated from its original date and such alien shall be deported under such previous order at any time subsequent to such reentry.  For the purposes of subsection (e) of this section the date on which the finding is made that such reinstatement is appropriate shall be deemed the date of the final order of deportation.

The practice of reinstatement set forth in § 242(f) appears "to have fallen into desuetude before its repeal." *Castro-Cortez*, 239 F.3d at 1040 n.1.  With the sweeping changes implemented by IIRIRA, came a new, expanded reinstatement provision.

IIRIRA repealed § 242(f) and added a new reinstatement provision, INA § 241(a)(5), codified at 8 U.S.C. § 1231(a)(5), which provides:

Reinstatement of removal orders against aliens illegally reentering

If the Attorney General finds that an alien reentered the United States illegally after having been removed or

seeking a stay of removal must show either (1) a probability of success on the merits and the possibility of irreparable injury, or (2) that serious legal questions are raised and the balance of the hardships tips in the alien's favor.  Without addressing the proper standard for granting a stay, the Seventh Circuit has required an alien seeking asylum to demonstrate the general criteria developed for stays pending appeal:

(1) a likelihood of success on the merits; (2) that irreparable harm would occur if a stay is not granted; (3) that the potential harm to the movant outweighs the harm to the opposing party if a stay is not granted; and (4) that the granting of the stay would serve the public interest.

*Sofinet v. INS*, 188 F.3d 703, 706 (7th Cir. 1999). Additionally, in an unpublished order, this Court has required aliens seeking a stay of deportation to establish substantially similar criteria.  *See Haddad v. INS*, No. 99-4016, 2001 WL 302048 at * 3 (6th Cir. Mar. 22, 2001) (referencing the Court's September 30, 1999 order denying an alien's motion for a stay pending appeal).

Prior to the passage of IIRIRA, an alien such as Bejjani would have been entitled to an automatic stay upon petitioning for review of an immigration decision.  *See* 8 U.S.C. § 1105(a)(3) (1994), *repealed by* 8 U.S.C. § 1252(b)(3)(B).  We are well aware that IIRIRA eliminated the automatic stay provision, and thus, aliens are no longer entitled to a stay.  We believe, however, that the criteria set forth above establish the appropriate standard for issuing a stay of removal pending appeal.

The INS correctly argues that the stay issued in the matter was not necessary to preserve judicial review.  Section 1252(b)(3)(B) indicates that an alien with a meritorious petition may be removed before a court's review is complete. In our February 8, 2001 Order granting Bejjani's request for a stay of the order of deportation, we indicated that this matter presented a substantial question of law, noting that the Ninth Circuit's *Castro-Cortez* decision "calls into question the

253 F.3d 477, 480 (9th Cir. 2001) (en banc).[8]  The court focused on the use of the term "enjoin" in § 1252(f)(2) and the use of the term "stay" in § 1252(b)(3), and concluded that § 1252(f) limits injunctive relief, but does not apply to stays.  "The clear concern of the section is limiting the power of courts to enjoin the operation of the immigration laws, not with stays of removal in individual asylum cases." *Andreiu*, 253 F.3d at 481.  Section 1252(f) simply provides a standard for granting injunctive relief in removal proceedings which "trumps any contrary provision elsewhere in the law." *See id.* at 482.

Instead, *Andreiu* concluded that § 1252(b)(3)(B) grants courts the authority to stay an alien's removal pending a petition for review. *See id.* at 480.  Section 1252(b)(3)(B) provides that "[s]ervice of the petition on the officer or employee does not stay the removal of an alien pending the court's decision on the petition, *unless the court orders otherwise*." (emphasis added).  Although the Ninth Circuit appears to be the only Court of Appeals to expressly address this exact issue, the Seventh Circuit has applied § 1252(b)(3)(B) to requests for a stay of removal pending appeal. *See Lucacela v. Reno*, 161 F.3d 1055, 1058 (7th Cir. 1998); *Lal v. Reno*, No. 99-3160, 2000 WL 831801 at *1 (7th Cir. June 26, 2000).

Although § 1252(b)(3)(B) provides the courts of appeals with the authority to stay an alien's removal, it does not specify what standard is to be employed in evaluating the alien's request. *Andreiu*, 253 F.3d at 480.  In *Andreiu*, the Ninth Circuit adopted the standard from *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998).  Under the *Abbassi* standard, stay requests are evaluated according to the same standard employed in evaluating motions for preliminary injunctive relief.  Thus, the *Andreiu* court concluded that an alien

---

[8]Although the alien in *Andreiu* sought review of the denial of his asylum claim, the court's opinion that § 1252(f) does not apply to stays of removal was not grounded in asylum law.  Thus, *Andreiu*'s rationale is applicable to removal or reinstatement orders in general.

having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.[2]

IIRIRA was enacted on September 30, 1996, and the new reinstatement provision, INA § 241(a)(5),which was located in IIRIRA § 305(a)(5), became effective on April 1, 1997. *See* IIRIRA § 309(a).  Thus, IIRIRA was enacted and the reinstatement provision became effective after Bejjani reentered the country in April, 1996.

Initially, there appears to be little substantive difference between the reinstatement provisions.  Both require the following elements to be established: the identity of the alien; whether the alien was previously removed under a provision of the act subjecting him to reinstatement; and whether the alien illegally reentered the United States.  A closer examination, however, reveals that the new provision, § 241(a)(5) differs, in that it expands the types of orders subject to reinstatement, provides that the prior order of removal is not subject to being reopened or reviewed, and bars aliens from applying for any form of relief, other than a claim for asylum.

Significant differences also exist in the process which an alien is accorded under the concomitant implementing regulations.  Under the prior regulation, 8 C.F.R. § 242.23 (repealed 1997), an alien in reinstatement had a right to a hearing before an immigration judge ("IJ"), a right to develop a record, and a right to counsel.  Under the new regulation, 8 C.F.R. § 241.8, the alien has no right to a hearing before an immigration judge. Instead, an immigration officer conducts an investigation to determine the identity of the alien and whether the alien has been subject to a prior order of removal.

---

[2]IIRIRA replaced the concepts of "exclusion" and "deportation" with the concept of "removal." *See* IIRIRA § 309(d)(2).

The immigration officer must determine whether the alien unlawfully reentered the United States. The regulation provides:

> In making this determination, the officer shall consider all relevant evidence, including statements made by the alien, and any evidence in the alien's possession. The immigration officer shall attempt to verify an alien's claim, if any, that he or she was lawfully admitted, which shall include a check of Service data systems available to the officer.

8 C.F.R. § 241.8(a)(3).

The alien does not have a right to counsel. Although the alien may make a statement, the alien does not have a right to build an administrative record before an impartial immigration judge. The Ninth Circuit Court of Appeals has observed that "[t]he reinstatement process raises very serious due process concerns, and is caused not by a change mandated by Congress as part of IIRIRA, but by an administrative decision to amend the regulations governing reinstatement proceedings in the wake of IIRIRA." *Castro-Cortez*, 239 F.3d at 1048.

### A.  Legality of reentry

Bejjani maintains that he legally reentered in the United States in 1996 when he presented his Alien Registration Card ("ARC") at the port of entry in Boston, and was inspected and granted permission to reenter. The INS maintains that Bejjani presented an invalid ARC, and thus his reentry was illegal.

Section 241(a)(5) permits the reinstatement of a prior order of removal if the Attorney General finds that the alien reentered the country illegally after having been removed or having departed voluntarily. *See* INA § 241(a)(5), 8 U.S.C. § 1231(a)(5). Thus, if Bejjani's reentry was legal, § 241(a)(5) would not apply, and Bejjani's prior order of deportation would not be subject to reinstatement. As a practical matter, this would require the INS to initiate a new removal

### C.  Due Process

Our decision that INA § 241(a)(5) does not apply retroactively to illegal reentries which occurred prior to the effective date of § 241(a)(5) removes Bejjani's Due Process argument from our consideration. However, we note that our ruling is, in part, guided by the principle that where possible, a court should rule on a narrow ground in order to avoid a constitutional question. *See e.g.*, *Landgraf*, 511 U.S. at 267 n.21; *Castro-Cortez*, 239 F.3d at 1050; *St. Cyr v. INS*, 229 F.3d 406, 416 n.6 (2d Cir. 2000), *aff'd*, 121 S.Ct. 2271 (2001).

### D. Stay of Removal Order

On February 8, 2001, the Court issued an order staying the execution of the order of reinstatement, and staying the requirement that Bejjani report to an immigration officer on February 9, 2001 for deportation.

The INS argues this Court may grant a stay of removal only if the alien shows by "clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law." *See* 8 U.S.C. § 1252(f)(2). The INS however, does not fully quote § 1252(f)(2), which provides in its entirety:

> Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order is prohibited as a matter of law.

8 U.S.C. § 1252(f)(2).

Although this Court has not yet considered this issue, the Ninth Circuit Court of Appeals, sitting en banc, recently held that § 1252(f)(2) does not govern the issuance of a stay of removal pending appellate review. *See Andreiu v. Ashcroft*,

Finally, we agree with *Castro-Cortez*, that Congress's silence on the issue of § 241(a)(5)'s application is significant. Congress is presumed to be familiar with the judicial presumption against retroactive application, and thus Congress must explicitly provide for such. In the case of the INA's reinstatement provision, Congress eliminated retroactive language from the prior version, rejected a proposed version of the reinstatement provision which included retroactive language, and expressly provided the temporal scope for several provisions within Title III. Viewed in light of the presumption against retroactivity, Congress clearly did not intend for § 241(a)(5) to be applied to reentries which occurred prior to its effective date.

The INS relies solely on the inaccuracy of the negative inference argument in this context, to argue that congressional intent is not clear. Although the Court agrees with the INS on that point, we find that there is other overwhelming evidence of clear congressional intent that § 241(a)(5) should not apply retroactively to reinstate prior orders of removal of aliens who reentered the country prior to the effective date of § 241(a)(5). As a result, we need not address the second step of the *Landgraf* analysis, nor the question of whether *Chevron* deference is appropriate. The reinstatement provision set forth in INA § 241(a)(5) and 8 C.F.R. § 241.8 may not be applied to the reinstatement of Bejjani's order of deportation.[7]

discussion of IIRIRA § 309(a)(5), however, because there is no logical connection between it and the sections to which it has been compared, and IIRIRA Title III does not address distinct, diametrically opposed subject matters.

[7]This decision, of course, does not imply that Bejjani's order of deportation may not be reinstated. Our decision simply requires that if the INS chooses to reinstate that order, it must do so pursuant to pre-IIRIRA law and regulations.

proceeding against Bejjani in order to remove him from the country.

This Court has been presented with virtually no facts regarding Bejjani's reentry in 1996. This dearth of evidence is a direct result of the minimal process which § 241(a)(5) affords aliens such as Bejjani in reinstatement proceedings.[3] Moreover, this Court is prohibited from considering facts not in the administrative record, INA § 242(b)(4), 8 U.S.C. § 1252(b)(4)(A), and from remanding this matter to the district court for fact-finding. *See* INA § 242(a)(1), 8 U.S.C. § 1252(a)(1).

It would be difficult, if not impossible, for this Court to determine the legality of Bejjani's reentry based upon the meager record presented to the Court. In view of the Court's conclusions regarding other issues on this appeal, however, the Court accepts, for purposes of this appeal, the INS argument that Bejjani's 1996 reentry was not a legal reentry.

[3]The Ninth Circuit has summarized the difficulty the courts of appeals encounter in reviewing a claim of legal reentry under § 241(a)(5):

Denial of this right not only jeopardizes the chances for a fair determination initially, but it hampers our review of the INS decision. The INA precludes us from considering facts not in the administrative record, INA § 242(b)(4), and it also prohibits us from remanding this matter to the district court for fact-finding. INA § 242(a)(1). Thus, were we required to determine the validity of [the alien's] contention that he had not actually been deported or his claim that he had not actually illegally reentered, we would be deprived of the benefit of any evidence that [the alien] wished to introduce.

*Castro-Cortez*, 239 F.3d at 1049-50.

**B. Does INA § 241(a)(5) apply retroactively to aliens who reentered prior to the effective date of the amendment?**

**1. Retroactivity analysis**

The primary issue before this Court is whether the new reinstatement provision governs Bejjani's reinstatement proceeding.

As this Court has previously recognized, "[b]asic principles of fairness and notice underlie a judicial skepticism of statutory retroactivity." *Bartoszewka-Zajac v. INS*, 237 F.3d 710, 712 (6th Cir. 2001) (citing *Landgraf v. USI Film Products*, 511 U.S. 244, 272 (1994)). This judicial presumption against retroactivity can be overcome, however, "when Congress clearly intends that result." *Id.* (citing *Landgraf*, 511 U.S. at 268). The Supreme Court has recently stated that "despite the dangers inherent in retroactive legislation, it is beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect." *INS v. St. Cyr*, --- U.S. ----, 121 S.Ct. 2271, 2288 (2001). "A statute may not be applied retroactively, however, absent a clear indication from Congress that it intended such a result." *Id.*

Bejjani argues that § 241(a)(5) does not apply to him because his arrest, indictment, conviction, deportation and reentry all occurred prior to the enactment and effective date of IIRIRA. He maintains that § 241(a)(5) applies only to illegal reentries which occurred after April 1, 1997, the effective date of § 241(a)(5). Bejjani argues that the judicial presumption against retroactive legislation bars the INS from proceeding under § 241(a)(5), and asserts that the INS may only reinstate the prior order of deportation by proceeding under the prior reinstatement provision, § 242(f), 8 U.S.C. § 1252(f) (repealed) and the prior regulation, 8 C.F.R. § 242.23 (repealed).

The INS maintains that the date of Bejjani's reentry is irrelevant, because the relevant date is the date on which the

within Subtitle C, no inference arises from comparing sections located within Subtitle C. It follows, then, that no inference can be drawn from comparing silent provisions located in Subtitle A to randomly selected express provisions in Subtitle C. Unlike the provisions at issue in *Lindh*, in IIRIRA, there is no clear distinction between silence in one provision and a clear statement of retroactivity in another. *See Velasquez-Gabriel*, 263 F.3d at 107 n.3.

However, comparing § 241(a)(5) to other provisions is useful in demonstrating that where Congress specifically wished for a provision to apply in a certain manner, Congress knew how to accomplish that, and did so throughout IIRIRA. The absence of an express directive from Congress, viewed in light of *Landgraf's* default rule, persuades us to agree with *Castro-Cortez*, that in this case, "congressional silence is instructive." *See* 239 F.3d at 1052. Moreover, this case differs from *Cervantes-Gonzales*, in which the provision at issue was moved to a different subtitle, and was placed among provisions with various temporal applications. In our case, the prior version of the reinstatement provision included retroactive language which was eliminated in drafting the amendments. Thus, it is not necessary to compare the reinstatement provision to other sections in other subtitles, in order to discern congressional intent, because the simple comparison between the prior version, (as well as the rejected version), and the current version is striking, and clearly conveys the intent of Congress.[6]

---

[6] In addition to asking the Court to follow *Castro-Cortez*, Bejjani also directs our attention to *Pak v. Reno*, 196 F.3d 666 (6th Cir. 1999) and several other decisions, in which courts addressing the retroactivity of a provision of the Antiterrorism and Effective Death Penalty Act, ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 *et. seq.* (1996), have relied on a negative inference to conclude that the provision does not apply retroactively. The sections compared in *Pak* and the other cases cited by Bejjani are analogous sections within AEDPA Title IV which address diametrically opposed subject matters. *See Sandoval v. Reno*, 166 F.3d 225, 241 (3d Cir. 1999), *Henderson v. INS*, 157 F.3d 106, 129 (2d Cir. 1998), *Goncalves v. Reno*, 144 F.3d 110, 130-31 (1st Cir. 1998). The negative inference employed in those cases does not apply in our

arises from comparing § 241(a)(5) to other IIRIRA sections which expressly provide for retroactive application.

Courts may use negative inference, which is a rule of statutory construction, to discern congressional intent. *See Sandoval*, 166 F.3d at 241-42. However, in *Hadix*, the Supreme Court explained that no negative inference arises from a comparison of a section with explicit retroactive language to a section which is silent as to its temporal scope, where the sections address "wholly distinct subject matters." *See Hadix*, 527 U.S. 343, 356 (1999). The Court agrees with the INS that comparing provisions which are located in different Subtitles and address distinct subject matters will not yield a logically sound inference as to the temporal scope of § 241(a)(5). Subtitle A, in which § 241(a)(5) is located, revises the procedures for removing aliens. Subtitle B deals with criminal aliens, and Subtitle C revises the grounds for exclusion and deportation. Thus, not only do the provisions which *Castro-Cortez* chose for comparison address different subject matters, they are not similar in any respect to § 241(a)(5). As the Fourth Circuit observed, "[t]hose subtitles govern different conduct and have no relation to the comprehensive revision of removal procedures contained in Subtitle A, which are at issue in this case." *See Velasquez-Gabriel*, 263 F.3d at 107.

The INS also criticizes *Castro-Cortez* for drawing a negative inference of prospective application from comparing § 241(a)(5) to provisions with express retroactive application. In *Lindh*, the Supreme Court compared a section of the Antiterrorism and Effective Death Penalty Act ("AEDPA") which specified that it would apply to cases pending on the date of the statute's enactment, to a section which was silent as to its application. *See Lindh*, 521 U.S. at 327. IIRIRA presents a different situation, because some sections of Subtitles B and C expressly provide for retroactive application, some expressly provide for prospective application, and some do not address the issue of temporal application at all. In *Cervantes-Gonzalez*, the Ninth Circuit concluded that given the various approaches to effective dates

reinstatement proceedings commenced. Since the reinstatement proceeding commenced well after the effective date of § 241(a)(5), there is no retroactivity issue.

Bejjani urges the Court to apply the retroactivity analysis set forth in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994) and *Lindh v. Murphy*, 521 U.S. 320 (1997). In *Landgraf*, 511 U.S. at 280, the Supreme Court wrote:

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

Pursuant to *Landgraf*, a court must first determine "whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. If Congress has expressly prescribed the statute's temporal scope, then the intent of Congress controls. If Congress has not done so, then a court must proceed to the second step and determine whether the statute acts retroactively by impairing a vested right, creating a new obligation, imposing a new duty, or attaching a new disability, with respect to transactions or considerations already past. *See id.* at 269.

In *Lindh v. Murphy*, 521 U.S. 320 (1997), the Supreme Court clarified the first step of the *Landgraf* analysis. The *Lindh* opinion directs that in determining the intent of Congress, a court should employ the "normal rules" of statutory construction. *See id.* at 326. This means that the court must first decide whether Congress has expressly

prescribed the statute's proper reach; if Congress has not expressly addressed the issue, then the Court must use normal rules of statutory construction, and examine the text, structure and history of the legislation to determine if Congress has clearly expressed an intent regarding the question of temporal scope. *See id.; Landgraf*, 511 U.S. at 262.

The INS argues that the *Landgraf* analysis is not applicable because *Landgraf* is used only to determine whether a newly enacted statute should be applied to a case *pending* at the time of its enactment or effective date. The INS contends that retroactivity is not implicated in this matter, and thus the *Landgraf* analysis should not govern, because no proceeding involving Bejjani was pending at the time of IIRIRA's enactment or at the time the reinstatement provision became effective. According to the INS, Bejjani's previous deportation proceeding ended when he left the country in March, 1996, and the current reinstatement proceeding did not begin until January, 2001.

The INS correctly argues that no proceeding involving Bejjani was pending at the time of the IIRIRA's enactment or effective date. However, this does not necessarily mean that the issue of retroactivity is not implicated. Although the INS did not initiate the reinstatement proceeding until 1999, the conduct which serves as the basis for the proceeding, Bejjani's allegedly illegal reentry, occurred in 1996, prior to the statute's enactment and effective date.

The INS asserts that the Court should utilize the analysis set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984), and defer to the INS interpretation concerning the applicability of § 241(a)(5). The INS does not, however, direct our attention to any particular "interpretation" rendered by the agency.[4]

---

[4] We need not accord deference to informal agency interpretations or opinions. *See e.g., Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters--like interpretations contained in policy statements, agency manuals, and

Should the Attorney General find that any alien has unlawfully reentered the United States after having previously departed or been deported pursuant to an order of deportation, *whether before or after the date of enactment of this Act*, on any ground described in any of the paragraphs enumerated in subsection (e), the previous order of deportation shall be deemed to be reinstated from its original date and such alien shall be deported under such previous order at any time subsequent to such reentry. For the purposes of subsection(e) the date on which the finding is made that such reinstatement is appropriate shall be deemed the date of the final order of deportation.

H.R. Rep. No. 104-469(I) at 416-17 (1996), 1996 WL 168955 (emphasis added); S. Rep. No. 104-249 at 118, (1996), 1996 WL 180026 (emphasis added).

Thus, not only did Congress eliminate the retroactive language from § 1252(f), it also considered and rejected new language which would have applied the new reinstatement provision to illegal reentries which occurred before the date of enactment. Thus Congress not only removed retroactive language from the INA's reinstatement provision, it also rejected new retroactive language which would have been included in § 241(a)(5). *See Cardoza-Fonseca*, 480 U.S. at 442-43 ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that is has earlier discarded in favor of other language"); *Pak*, 196 F.3d at 676 ("Ostensibly, Congress had considered a retroactivity provision but decided against it. With such strong evidence of congressional intent, we refuse to include in the language of the statute a provision that Congress chose to omit").

The Court next turns to the INS argument that *Castro-Cortez*'s reliance on the negative inference argument is misplaced. First, the INS argues that the Court cannot rely on provisions located in subtitles which address different subject matters. Second, the INS asserts that no negative inference

of 1996 made sweeping revisions of immigration policy"); *Ashki v. INS*, 233 F.3d 913, 917 (6th Cir. 2000) (IIRIRA was "designed to expedite the removal of deportable aliens and to limit their ability to obtain discretionary relief from deportation"). *See also Ayala v. Reno*, 995 F.Supp. 717, 718 (W.D. Texas 1998) ("As set forth, section 241(a)(5) indicates that Congress intended to expel aliens from the United States without any opportunity to challenge the prior deportation order or to apply for relief if they ever illegally reentered after deportation"). However, as the Supreme Court has recently recognized, "[b]y itself, the comprehensiveness of a congressional enactment says nothing about Congress's intentions with respect to the retroactivity of the enactment's individual provisions." *St. Cyr*, 121 S.Ct. at 2288.

Given Congress's general approach in IIRIRA to revising immigration law, one would expect Congress to have left the § 242(f) retroactive language substantially intact, thereby ensuring the retroactive application of § 241(a)(5), the new, more stringent reinstatement provision. But Congress did not leave that language intact, nor did it amend the language to incorporate the effective date of § 241(a)(5). Congress completely eliminated the retroactive language from the new provision. We agree with the Ninth Circuit that the complete elimination of the retroactive language from the reinstatement provision is persuasive evidence that Congress did not intend for the new reinstatement provision to apply to reentries which occurred prior to the statute's effective date. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that is has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (internal quotation omitted).

This conclusion is supported by the legislative history of § 241(a)(5). *See id.* at 432 (using legislative history to confirm textual reading of statute); *Sandoval*, 166 F.3d at 241 (same); *Pak*, 196 F.3d at 676 (same). Both the House and the Senate considered a version of the reinstatement provision which included retroactive language:

Under *Chevron*, an agency's interpretation of a statute must be accorded deference where Congress has left a gap for the agency to fill, or where the agency offers a reasonable interpretation of a provision that is ambiguous or uncertain. *See Toledo Hospital v. Shalala*, 104 F.3d 791, 797 (6th Cir. 1997), *judgment vacated on other grounds*, 522 U.S. 1145 (1998). In determining whether such deference is appropriate, however, the Court must engage in a two-step analysis. In a prior opinion addressing the retroactivity of another IIRIRA provision, this Court explained the *Chevron* analysis as follows:

> *Chevron* requires us first to ask whether Congress's intent is clear as to the precise question at issue. If by "employing standard tools of statutory construction," we determine that Congress's intent is clear, "that is the end of the matter." It is only when a statute is silent or ambiguous that a court must determine whether an agency's interpretation is a permissible construction of

---

enforcement guidelines, all of which lack the force of law--do not warrant *Chevron*-style deference"); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988) (interpretation advanced for first time in litigation not entitled to deference); *Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 828 (10th Cir. 2000) ("A position taken by an agency during litigation, however, is not sufficiently formal that it is deserving of *Chevron* deference").

Although the INS does not direct our attention to any particular interpretation, we can surmise that the INS would have this Court defer to *Matter of G-N-C*, Int. Dec. 3366 (BIA 1998) and 8 C.F.R. § 241.8. However, these items do not support the government's position. *See Castro-Cortez v. INS*, 239 F.3d 1037, 1052 (9th Cir. 2001). In *Matter of G-N-C*, the INS reinstated the order of deportation of an alien who was deported in 1991 and illegally reentered the country in 1995. The BIA concluded that it did not have jurisdiction to review the INS decision to reinstate a prior order of deportation pursuant to § 241(a)(5). The BIA did not address the issue of applying § 241(a)(5) retroactively. With respect to 8 C.F.R. § 241.8, the implementing regulation for § 241(a)(5), a plain reading of the regulation reveals that it does not address whether the reinstatement provision may be applied to aliens who reentered the country prior to the effective date. *See* 8 C.F.R. § 241.8(a); *Castro-Cortez*, 239 F.3d at 1052 n.18.

the statute. These standard tools of statutory construction used to determine Congress's intent include the familiar presumptions that are applied, including the presumption against retroactivity set forth in *Landgraf v. USI Film Prods.*

*Pak v. Reno*, 196 F.3d 666, 675 (6th Cir. 1999) (citations omitted). *See also Toledo Hospital*, 104 F.3d at 795 (congressional intent "can appear in the language of the statute, or it can become apparent in light of the statutory scheme taken as a whole").

In *Pak*, the INS argued that the Court should defer to the Attorney General's earlier interpretation of the provision at issue, in which the Attorney General concluded that the provision was fully retroactive. *See Pak*, 196 F.3d at 675. Although the Court ultimately did not address the second *Chevron* inquiry because it concluded that Congress had clearly expressed its intent that the provision should not apply retroactively, the Court noted its doubt that *Chevron* is applicable to the issue of retroactivity. The Court wrote:

> It is uncertain whether *Chevron* applies in this case, even if there had been an absence of an expression of congressional intent. "Chevron appears to speak to statutory interpretation in those instances where Congress delegated rule-making power to an agency and thereby sought to rely on agency expertise in the formulation of substantive policy." Determining a statute's temporal reach, however, does not require agency expertise, but, rather, presents a "pure question of statutory interpretation for the courts to decide." Accordingly, some courts advance the position that this determination may be made "without affording any deference to the Attorney General."

*Id.* at 675 n.10 (internal citations omitted).

Other circuits have likewise questioned the propriety of *Chevron* deference when determining the temporal scope of a statute. *See e.g.*, *Jurado-Gutierrez v. Greene*, 190 F.3d

pending cases, and others are completely silent as to their application. *See id.*

The court held that because Congress's motive in moving the provision was ambiguous, and because of the various temporal provisions set forth within Subtitle C, no inference could be drawn as to the lack of an effective date for IIRIRA § 349. *See id.* According to the INS, if no inference arises from comparing sections within Subtitle C, then surely no inference arises from comparing a section like § 241(a)(5) which is located in Subtitle A, to sections located in Subtitle C.

### 4. Analysis

In determining the application of § 241(a)(5), we begin by considering the difference between § 241(a)(5) and its predecessor, § 242(f). As set forth above, the INA's initial reinstatement provision, § 242(f), was enacted in 1952. Section 242(f) expressly provides that reinstatement applies to illegal reentries which occurred "before or after June 27, 1952." This language clearly expressed Congress's intent that prior orders of deportation could be reinstated even if the alien reentered the country prior to the enactment of that reinstatement provision. That language, however, was removed from the new reinstatement provision at issue in this case, § 241(a)(5).

The INS argues that Congress intended § 241(a)(5) to be "substantively different" from § 242(f), and thus a comparison of the provisions can be misleading. We understand the INS to mean that Congress intended to strengthen this provision and render reinstatement proceedings easier to initiate and execute.

We agree that Congress intended the new provision to be substantively different, and fully recognize that the highly-detailed, comprehensive nature of IIRIRA was a result of Congress seeking to strengthen immigration laws. *See e.g.*, *Bartoszewska-Zajac v. INS*, 237 F.3d 710, 712 (6th Cir. 2001) ("The Illegal Immigration and Immigrant Responsibility Act

problems with the negative inference argument. First, the INS argues that a negative implication may not be drawn from a comparison of sections which address distinct subject matters. The INS relies on *Martin v. Hadix*, 527 U.S. 343, 356 (1999), in which the Supreme Court indicated that the negative inference argument may be used only when comparing sections of a statute which address similar subject matters. Where the statutory sections address "wholly distinct subject matters," no negative inference arises. *See id.* at 356. Second, the INS finds fault with the negative inference that because Congress specified the temporal scope of several provisions of the IIRIRA, but did not do so for § 241(a)(5), Congress must have intended that the provision would not be applied to pre-enactment conduct. The INS argues that *Castro-Cortez* ignored the fact that IIRIRA has a wide variety of temporal scope provisions, and that no negative inference arises simply because the court was able to pick out three sections which are expressly retroactive. The INS notes that some sections are expressly prospective, *see e.g.*, § 341, some expressly apply to pending cases, and some, like § 241(a)(5), have no express temporal scope whatsoever. The INS argues that drawing a negative inference from comparing § 241(a)(5), which is located in Subtitle A, to sections located in Subtitles B and C, is prohibited by another Ninth Circuit decision, *Cervantes-Gonzales v. INS*, 244 F.3d 1001 (9th Cir. 2001).

In *Cervantes-Gonzalez*, the court considered § 212(i) of the INA, which is silent as to whether it applies to cases pending at the time the INA was amended. *See id.* at 1005. When the House passed its version of IIRIRA, the section which eventually became § 212(i) was placed under Subtitle A of Title III. *See id.* Section 309 of Subtitle A generally provides that provisions under Subtitle A do not apply to pending cases. *See id.* In the final version of the bill which was enacted, however, the section which became § 212(i) was moved from Subtitle A to Subtitle C, § 349. *See id.* Within Subtitle C, some sections specifically provide for prospective application, others specifically provide for application to

1135, 1148 (10th Cir. 1999), *cert. denied*, 529 U.S. 1041 (2000) (noting that the determination of a statute's temporal reach does not involve any "special agency expertise," and reaching such determination without affording any deference to the Attorney General); *Sandoval v. Reno*, 166 F.3d 225, 239 (3d Cir. 1999) (noting doubt that *Chevron* deference is appropriate in determining a statute's effective date, but assuming arguendo that *Chevron* does apply, and finding under the first step that Congress expressed its intention that the statute not be applied retroactively); *Goncalves v. Reno*, 144 F.3d 110, 127 (1st Cir. 1998) ("We think it is a significant question whether the determination of the application of the effective date of a governing statute is the sort of policy matter which Congress intended the agency to decide and thus whether the doctrinal underpinnings of *Chevron* are present here") (internal citations omitted).

The Supreme Court recently addressed the propriety of *Chevron* deference in determining the retroactivity of another section of IIRIRA. *See St. Cyr*, 121 S.Ct. 2271. In *St. Cyr*, the INS argued that the Court should defer to its interpretation regarding the retroactivity of the section. The Court wrote:

> We only defer, however, to agency interpretations of statutes that, applying the normal "tools of statutory constructions" are ambiguous. Because a statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously prospective, there is, for Chevron purposes, no ambiguity in such a statute for an agency to resolve.

*St. Cyr*, 121 S.Ct. at 2290 n.45 (internal citations omitted).

Construing *St. Cyr*, the Fourth Circuit recently considered the exact issue before this Court, and concluded that *St. Cyr* bars a court from deferring to the BIA's interpretation of § 241(a)(5)'s application. *See Velazquez-Gabriel*, 263 F.3d at 106 n.2.

In light of *St. Cyr*, *Velazquez-Gabriel*, and *Pak*, this Court finds that *Chevron* is not applicable to the issue before the

Court.   However, even if we were to apply the *Chevron* analysis, it requires the same initial inquiry as the *Landgraf* analysis, i.e., whether Congress's intent is clear as to the retroactive application of § 241(a)(5). If we find that the intent of Congress is clear, either from the express statutory language, or from an interpretation of the language using the normal rules of statutory construction, we need not defer to the INS interpretation. *See Castro-Cortez*, 239 F.3d at 1053.

**2. The intent of Congress**

As a preliminary matter, we note that two other Circuits have addressed the exact issue before this Court and have reached contrary conclusions. In *Castro-Cortez v. INS*, 239 F.3d 1037 (9th Cir. 2001), the Ninth Circuit Court of Appeals held that § 241(a)(5) does not apply retroactively to aliens who reentered the country prior to IIRIRA's effective date. The court reached this conclusion by finding that Congress intended § 241(a)(5) to encompass only reentries which occurred after the effective date. After the oral argument of this case, the Fourth Circuit Court of Appeals decided *Velasquez-Gabriel v. Crocetti*, 263 F.3d 102 (4th Cir. 2001). The Fourth Circuit concluded that § 241(a)(5) applies to an alien who reentered the country prior to the statute's effective date. Unlike the Ninth Circuit, however, the Fourth Circuit concluded that Congress did not express any intent as to § 241(a)(5)'s application. Thus, the court focused on the second *Landgraf* step, and concluded that the statute does not have an impermissible retroactive effect as applied to the alien in question. Although the parties did not have the benefit of the *Velasquez-Gabriel* opinion prior to the submission of this matter, we will nevertheless consider the opinion, because it represents the view of another circuit court.

Congress did not expressly address the applicability of § 241(a)(5) to aliens who reentered the country prior to the statute's effective date. Although IIRIRA § 309(a) sets forth a general effective date of April 1, 1997 for Title III-A, it does

in *Lindh*, where there was a "neat distinction" between silence and a clear statement of retroactivity. *See id.* at 107 n.3.

*Velasquez-Gabriel* then proceeded to the second step of the *Landgraf* analysis to determine whether § 241(a)(5) had an impermissible retroactive effect as applied to the alien. *See id.* at 108. The alien argued that § 241(a)(5) had an impermissible retroactive effect on him because it impaired a right he possessed prior to the statute's enactment, the right to request adjustment of his status based on his marriage to a United States citizen. *See id.* The court held that § 241(a)(5) did not have an impermissible retroactive effect, because the alien did not apply to adjust his status until after § 241(a)(5) took effect, even though he had ample opportunity to do so prior to that time. Thus, the alien could not demonstrate a detrimental reliance on pre-IIRIRA law. *See id.* at 108-09.

**3. The parties' arguments**

Bejjani urges this Court to follow the *Castro-Cortez* decision. The INS contends that *Castro-Cortez* was wrongly decided.

First, the INS finds fault with the court's reliance on the elimination of the retroactivity language which was included in § 242(f). According to the INS, IIRIRA is a comprehensive legislative scheme which dramatically changed immigration law, and thus, comparisons between IIRIRA provisions and their predecessors can be misleading. Specifically, the INS points out that § 241(a)(5) expanded the government's authority, and is more harsh than § 242(f), and argues that these changes indicate that Congress intended the new provision to be substantively different. According to the INS, a "crackdown" on illegal reentries would necessarily entail retroactive application of the new reinstatement provision.

Second, the INS argues that *Castro-Cortez* improperly compared § 241(a)(5), which is located in Subtitle A of Title III of IIRIRA, to provisions located in Subtitles B and C. Like the *Velazquez-Gabriel* opinion, the INS raises two

After the oral argument in this case, the Fourth Circuit concluded in *Velasquez-Gabriel v. Crocetti*, 263 F.3d 102, that § 241(a)(5) does not evidence a clear congressional intent regarding its temporal scope. Mirroring the *Castro-Cortez* decision, the alien argued that because Congress inserted express retroactivity provisions in certain provisions in Title III, but did not do so in § 241(a)(5), the court must draw a negative inference that § 241(a)(5) is not intended to apply retroactively. The Fourth Circuit rejected the negative inference argument for two reasons. First, the court noted that although Congress made several provisions in Title III expressly retroactive, it also made several provisions expressly prospective. Thus, no inference arises because Congress explicitly provided for both retroactive application and prospective application throughout Title III, while failing to address the issue at all for some provisions in Title III. *See id.* at 106-07. Second, the court noted that all of the expressly retroactive statutory provisions on which the alien relied appear in Subtitles B and C of Title III. *See id.* at 107. The court wrote:

> Those subtitles govern different conduct and have no relation to the comprehensive revision of removal procedures contained in Subtitle A, which are at issue in this case. Unlike Subtitles B and C, Subtitle A includes a general effective date that applies to almost all of its provisions. *See* IIRIRA § 309(a). Thus, it is not surprising that many sections of Subtitles B and C have their own effective dates and § 241(a)(5) does not. The mere fact that the individual effective date provisions in Subtitles B and C contain express temporal restrictions sheds no light on Congress's intent regarding § 241(a)(5)'s application to pre-enactment reentries.

*Id.* at 107. The court acknowledged *Castro-Cortez*'s reliance on the negative inference, but disagreed with that reliance, based on the "distinct subject matters" addressed in the different subtitles. The court noted that § 241(a)(5) and IIRIRA present a situation distinguishable from that presented

not provide guidance as to whether § 241(a)(5) should apply to aliens who reentered prior to that date. As the Supreme Court has recently noted:

> [T]he mere promulgation of an effective date for a statute does not provide sufficient assurance that Congress specifically considered the potential unfairness that retroactive application would produce. For that reason, a 'statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.'

*St. Cyr*, 121 S.Ct. at 2289 (quoting *Landgraf*, 511 U.S. at 257). Thus, employing the standard tools of statutory construction, we must determine whether Congress clearly expressed an intent on this issue. We will address this question by examining the *Castro-Cortez* and *Velasquez-Gabriel* opinions, and second, by considering the arguments of the parties.

In *Castro-Cortez v. INS*, the Ninth Circuit Court of Appeals held that § 241(a)(5) applies only to aliens who reentered the United States after the statute's effective date, because Congress clearly intended that the statute should not be applied retroactively to aliens who reentered prior to that time. *See Castro-Cortez*, 239 F.3d at 1051, 1053. The court's opinion was based on three aspects of § 241(a)(5).

First, § 241(a)(5) replaced § 242(f), the prior reinstatement provision which was enacted in 1952. Section 242(f) specified that reinstatement was applicable to reentries "whether before or after June 27, 1952." When Congress replaced § 242(f) with § 241(a)(5), the new reinstatement provision, it completely eliminated the retroactivity language, instead of leaving intact the retroactivity language from the prior provision, or simply modifying the date. *See Castro-Cortez*, 239 F.3d at 1051. According to *Castro-Cortez*, "Congress's decision to remove the retroactivity language from this part of the statute provides strong support for the conclusion that it did not intend that the revised provision be

applied to reentries occurring before the date of the statute's enactment." *See id.* at 1051.

Second, *Castro-Cortez* examined the rest of IIRIRA, and concluded that where IIRIRA changes rules for conduct which occurred prior to the effective date, Congress specifically indicated that those sections would apply to pre-enactment conduct. Thus, *Castro-Cortez* reasoned, by negative implication, that the failure to expressly provide for retroactive application in § 241(a)(5) indicates that Congress did not intend for the reinstatement provision to apply retroactively to aliens who reentered the country prior to April 1, 1997. *See id.* at 1051.

To support the negative implication argument, the court examined several provisions of IIRIRA which specify that they apply to pre-enactment conduct. The court first examined § 321, located in Subtitle B, which modifies the definition of "aggravated felony," and provides that the term applies regardless of whether the conviction was entered "before, on, or after the date of enactment." *See id.* at 1051. The court next examined provisions which provide that conduct which occurred before enactment may subject an alien to exclusion or prohibit a waiver. *See id.* at 1051-52. The court cited as an example, § 347(c), located in Subtitle C, which provides that an exclusion because of unlawful voting applies to any alien who has voted "before, on, or after" the date of enactment. *See id.* at 1052. Finally, the court examined § 351(c), also located in Subtitle C, which provides that certain amendments to the INA shall apply to applications for waivers filed "before, on, or after" the date of enactment. *See id.* Thus, by comparing § 241(a)(5) which is silent as to application, to other IIRIRA sections which specify that they are to be applied retroactively, the court concluded that Congress must have intended that § 241(a)(5) would not apply retroactively to pre-enactment illegal reentries.

Third, *Castro-Cortez* relied on Congress's silence as to the issue of retroactivity to conclude that Congress must have

intended that § 241(a)(5) would not apply to reentries prior to the effective date. The court noted that after *Lindh*, "Congress is deemed to enact legislation with *Landgraf*'s 'default rule' in mind," and must be explicit if it intends a provision to be applied retroactively. *See id.* at 1052.

Thus, in concluding that Congress did not intend § 241(a)(5) to apply to aliens who reentered the country prior to the statute's effective date, *Castro-Cortez* relied on: (1) Congress's decision to remove the express retroactivity language from the INA's reinstatement provision; (2) Congress's decision to expressly make several other IIRIRA provisions applicable to pre-enactment conduct; and (3) Congress's failure to include language applying § 241(a)(5) to illegal reentries which occurred prior to April 1, 1997.

As a result of finding a clear expression of congressional intent, *Castro-Cortez* did not proceed to the second step of the *Landgraf* analysis. *See id.* at 1052. The court refused to accord the Attorney General's interpretation *Chevron* deference because, given the extremely detailed rules setting forth IIRIRA's application, the court found it "inconceivable that Congress intended to delegate to the BIA the decision whether to apply INA § 241(a)(5) to conduct that pre-dates its enactment." *Id.* at 1053. The detailed transition rules evidence that Congress "assumed for itself the task of determining when and how IIRIRA's various provisions would become applicable." *Id.* Moreover, because the court concluded that § 241(a)(5) is not ambiguous as to congressional intent, deference to the INS interpretation was not appropriate.[5]

---

[5] Judge Fernandez dissented from the panel's opinion, and argued that § 241(a)(5) may be retroactively applied to aliens who illegally reentered the country prior to the statute's effective date, because such individuals did not act in reliance on the prior reinstatement provision, and because the statute does not affect any vested rights, nor does it impose any new duties or new liabilities. Although the dissent would permit the retroactive application of § 241(a)(5), it expressed doubt, in dicta, regarding the constitutionality of the "harsh--even peculiar" regulations implementing § 241(a)(5). *See id.* at 1056 (Fernandez., J., dissenting).